# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
September 1, 2015 Session

## STATE OF TENNESSEE v. ANTHONY WILSON and DEANGELO TAYLOR

**Appeal from the Criminal Court for Shelby County**
**No. 1300998     W. Mark Ward, Judge**

_____

**No. W2014-01054-CCA-R3-CD  -  Filed December 11, 2015**

_____

Both of the appellants, Anthony Wilson and Deangelo Taylor, stand convicted of first degree murder and attempted first degree murder. The trial court sentenced them to life for the first degree murder conviction and to twenty years for the attempted first degree murder conviction. The trial court aligned appellant Taylor's sentences consecutively and appellant Wilson's sentences concurrently. On appeal, appellant Taylor argues that: (1) the trial court erred in instructing the jury on criminal responsibility for the conduct of another; (2) the evidence was insufficient to support appellant's convictions; (3) the trial court erred in failing to instruct the jury on self-defense and defense of others; (4) the trial court erred in failing to declare a mistrial after the State told the jury that appellant was in jail; (5) the trial court erred in admitting into evidence a close-up autopsy photograph of the victim's face; (6) the trial court erred in admitting Chris Williams' statement as substantive evidence pursuant to Tennessee Rule of Evidence 803(26); (7) there was cumulative error that requires reversal; and (8) the trial court erred in aligning appellant's sentences consecutively. Appellant Wilson argues that the trial court erred in failing to grant his Motion for Acquittal because the proof at trial was inconsistent and insufficient and also erred in admitting into evidence Jarquez McKinley's police statement as substantive evidence pursuant to Tennessee Rule of Evidence 803(26). Following our thorough review of the arguments, record, and the applicable law, we affirm the judgments of the trial court but remand for correction of appellant Taylor's attempted murder judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed; Remanded**

ROGER A. PAGE, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and TIMOTHY L. EASTER, JJ., joined.

Dewun R. Settle, Memphis, Tennessee, for the Appellant, Anthony Wilson.

Lance R. Chism (on appeal), and Lauren M. Fuchs and Anna Lee Benson (at trial), Memphis, Tennessee, for the Appellant, Deangelo Taylor.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Colin A. Campbell and Tracye N. Jones, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

This case concerns a large street fight that erupted in Memphis, Tennessee. The altercation began because Ronisha[1] believed that Stefanie had stolen a camera from someone's home. Multiple members of each girl's family became involved in the argument, which escalated to a physical altercation on McMillan Street on October 20, 2010. Initially, the fight only involved the women of each family; however, male members of the families and males who were observing the fight soon joined the fray. Lyle King and Julian Williams joined the altercation on behalf of Stefanie's family members, and appellants and codefendant Alfred Robinson sided with Ronisha's family. The physical altercation ultimately led to a shootout, causing the death of the victim, Lyle King,[2] and the injury of Julian Williams and appellant Taylor. As a result of the shooting, appellant Taylor, appellant Wilson, and Alfred Robinson were indicted for the first degree murder of the victim, attempted first degree murder of Mr. Williams, and employing a firearm during the commission of a dangerous felony. Appellants' trial began on February 4, 2014. The jury convicted appellants Taylor and Wilson as charged and found co-defendant Robinson not guilty on all counts.

---

[1] Because several parties and witnesses share the same last name, for clarity, we will refer to everyone with the last names "King," "Johnson," and "Carter" by their full name or by their first name only. It is also the policy of this court to protect the identity of minors; as such, we will refer to any known minors by their first names. In doing so, we mean no disrespect. Also, throughout the duration of this opinion, we will endeavor to use individuals' formal names, rather than their nicknames, when it is clear from the testimony and context which person is referenced. Many of the individuals' full names are revealed in subsequent or prior testimony. Due to the frequency of this occurrence throughout the facts, we will not indicate each instance that a witness uses a nickname rather than a formal name.

[2] Although both Lyle King and Julian Williams were victims in this case, for ease of reference, we will refer to the deceased victim, Lyle King, as "the victim," and we will refer to Julian Williams by his full name or "Mr. Williams."

## I.  Facts

Trichuna Butler, the victim's sister, testified that on October 20, 2010, she, Montoya Trezevant, Lucilla (her younger sister who was fifteen at the time), the victim, and Julian Williams (a friend of the victim) went to McMillan Street in Memphis, Tennessee, after Ms. Trezevant received a telephone call from Cheryl, Ms. Butler's cousin, informing them that several females had "tried to jump her."  After the group arrived, Ms. Butler saw her cousin, Makala, who was thirteen or fourteen at the time, standing in the street.  She also saw Mary Johnson, whose three children were also present, arrive at the scene.  Vanita King, Ms. Butler's aunt, pulled up behind Ms. Butler to tell the group that she had already picked up Cheryl and Stefanie, who were with Vanita.  Ms. Butler did not recognize the other individuals present at the scene.

Everyone exited their vehicles and a fight ensued between several women after a female hit Cheryl.  Ms. Butler explained that initially, Mr. Williams and the victim were "standing back" from the fight and that the victim tried to stop the fight.  However, after the victim saw one of Mary Johnson's sons, Jarquez McKinley, hit Lucilla, the victim's sister, the victim joined the fight, fighting with the other males present.  Ms. Butler explained that she then noticed an influx of males at the scene and that she joined her brother in fighting the males.  Ms. Butler approximated that there were more than twenty people involved at that point.  Ms. Butler then heard multiple gunshots, and everyone fled the scene.  Ms. Butler explained that she ran inside someone's house.  Ms. Butler heard three different guns firing, stating that the weapons sounded different; however, she did not see who was firing the weapons.  After Ms. Butler was inside the house to which she ran for shelter, she looked outside and saw a car drive away and her brother lying on the ground with Mr. McKinley "stomping him."  Mr. McKinley picked up a large garbage can and threw the garbage can on top of the victim.  Mr. McKinley's brother, Brandon, pulled Mr. McKinley away from the victim.  Ms. Butler and several other people at the scene attempted to help the victim, and Ms. Butler saw that the victim was bleeding.  Ms. Butler asserted that neither the victim nor anyone who arrived at the scene with her had a gun.  Ms. Butler did not know what caused the fight.

During cross-examination, Ms. Butler explained that Vanita was Cheryl's mother.  Ms. Butler also stated that Cheryl was on speaker phone when she asked Ms. Trezevant to pick her up and that all five people who went to the scene had heard Cheryl say that a group of girls had tried to "jump her."  Ms. Butler stated that the five of them rode to the scene in Ms. Trezevant's gold Lexus.  Although confronted with her police statement in which she said Cheryl and Stefanie were standing outside when Ms. Butler arrived, Ms. Butler asserted that only Eisha King and her daughter Makala were outside when the group arrived.  Ms. Butler and Ms. Trezevant exited the car and spoke to Makala, and Vanita pulled in nearby.  Cheryl got out of the car to speak with Ms. Butler, Ms. Trezevant, and Makala.  Ms. Butler explained that Mary Johnson arrived in a red truck

with "a lot" of females inside. Ms. Butler testified that it was one of the females with Mary who began the fight. Ms. Butler explained that the victim's attempt to break up the fight consisted of his trying to separate Ms. Butler and her aunt from the fight. Ms. Butler stated that Mr. McKinley's hitting Lucilla and the victim's attempting to pull her away were the first times that men entered the fight. However, afterward, men began joining the fight from "everywhere." Ms. Butler said that during the fight, she saw Mr. Williams beside her and that she then began hearing the gunshots. Ms. Butler explained that after the shooting, she was only in the house for two or three minutes before she went back outside. Ms. Butler stated that Mr. McKinley's brother pulled Mr. McKinley off of the victim and that Mary told her son to leave the victim alone. Ms. Butler explained that she did not know most of the people involved because she did not live in that neighborhood. Ms. Butler explained that she was nineteen at the time of the shooting. Ms. Butler agreed that she did not tell the police that she heard three different guns fire.

Joycelyn Key, a resident of McMillan Street, testified that she witnessed the fight and resulting shootout on October 20, 2010. Ms. Key was located three to five houses from the incident. She explained that "children" from the neighborhood were involved in a verbal argument and that a physical altercation between both women and men ensued. Ms. Key explained that when the fighting began, she hid behind her car and that she was still hiding there when she heard multiple gunshots. Ms. Key asserted that she heard so many gunshots that she believed she would see "a lot" of deceased people when it was over. Ms. Key stated that she never saw the victim with a gun but that she saw two other shooters. Ms. Key elaborated that one shooter was wearing a black shirt and holding a black gun and that he was standing on the left side of the street. Ms. Key described the other shooter as wearing a silver shirt and holding a silver gun, standing on the right side of the street. Both individuals shot into the crowd in the street, and the victim's injuries resulted. Ms. Key explained that after the victim fell to the ground, the shooter with the silver gun shot the victim approximately three times. Ms. Key testified that after the shooting, the man with the silver gun walked down the street toward her. She did not see where the shooter with the black gun went. Ms. Key explained that she later identified the shooter with the black gun from a photographic array. In court, Ms. Key identified appellant Taylor as the shooter with the black gun and denied seeing co-defendant Robinson during the fight. Ms. Key explained that she did not know the shooter with the silver gun but asserted that she had previously identified that individual.

During cross-examination, Ms. Key explained that she saw the fight taking place as she drove to her home. She had just stopped at her home and exited her car when the gunfire began, which caused her to hide behind her car. She explained that she then looked around the side of her car to see what was occurring. Ms. Key agreed that the scene was "[p]andemonium." She testified that she did not see who initially started shooting during the fight. Ms. Key stated that the shooter with the silver gun appeared to be in shock when he was walking down the street with another man after the shooting.

-4-

She described that shooter as being short, black, and dark-complected.  She described the man with whom he was walking as being short with a "funny eye."  Ms. Key asserted that the two men seemed to be friends and that the shooter's friend told the shooter to give him the gun.  Ms. Key described the man with the black gun as taller, black, and light-complected.

During redirect examination, Ms. Key asserted that she had identified the shooter in the silver shirt in "A3" of the photographic spread; however, there was no indication on the document that an identification had been made.   During recross-examination, Ms. Key claimed that the police officers told her to circle the person whom she identified in spread C but that they did not tell her to circle her choice in spread A.

Memphis Police Department ("MPD") Detective Robert Wilkie explained that "A3" of Ms. Key's photographic spread was not circled because Detective Wilkie knew that the person in the A3 photograph was incarcerated when this crime occurred.  Therefore, instead of having Ms. Key circle the photograph, he noted on the bottom of the page that a positive identification had not been made.  During cross-examination, Detective Wilkie elaborated that when Ms. Key chose the A3 photograph, she stated that the person "'kind of looked like'" the other shooter.  She did not make a definitive identification.

Cheryl testified that she was seventeen at the time of trial and that she was thirteen at the time of the October 2010 incident.  Cheryl explained that the victim was her cousin and that she knew "Woo," whom she identified as appellant Taylor,[3] and "Tiny," whom she identified as codefendant Robinson, at the time of the incident.  Cheryl denied knowing appellant Wilson, also known as "Ant."  Cheryl testified that on October 20, 2010, she was staying with her cousin, Eisha, who lived on McMillan Street.  Cheryl and Stefanie had gone to visit friends elsewhere when they received a call from Eisha, telling them that Ronisha was looking for Stefanie.  After returning to McMillan Street, Ronisha and Ronisha's cousin Ashley were standing outside of Eisha's home claiming that they intended to fight Stefanie.  Ronisha and Ashley were soon joined by approximately eight other women.  Cheryl attempted to contact her mother to ask for someone to pick her up, but when her attempts were unsuccessful, she called her sister Montoya Trezevant.  However, Cheryl's mother arrived before Ms. Trezevant, and Ms. Trezevant was arriving as Cheryl, her mother, and Stefanie were leaving.  In response, Cheryl's mother turned around to inform Ms. Trezevant that Cheryl was with her.  Before the group could leave, another car blocked their vehicles, and Cheryl and Ashley began fighting in the street,

---

[3] While Cheryl only indicated that "Woo" was the appellant "in the black vest," the State more specifically asked Cheryl about the other two defendants and her knowledge of each.  Therefore, it is clear from the context of the questioning, that Cheryl was referring to appellant Taylor in her identification of "Woo."

which caused the other people present to begin fighting. Cheryl estimated that when the fight initially began, there were over twenty people present. Cheryl explained that the fight had been underway for about five minutes when she heard the first gunshots. Cheryl and Eisha ducked behind a bush. Cheryl then looked toward the gunshots and saw appellant Taylor standing over the victim shooting as the victim lay on the ground. Cheryl asserted that neither the victim nor Mr. Williams had a weapon during the fight. Cheryl could not remember how many shots were fired, and she did not see anyone else fire a weapon. Cheryl stated that after the shooting, appellant Taylor walked down the street, entered a truck, and left the scene. Cheryl testified that she did not see codefendant Robinson that day. After appellant Taylor fled the scene, Cheryl saw Jarquez McKinley, also known as "Jock," hit the victim with a trash can and stomp on the victim with his foot. Cheryl did not see Mr. McKinley with a gun.

During cross-examination, Cheryl elaborated that after her mother turned around to inform her sister that Cheryl and Stefanie were with her, Cheryl exited the car to tell Mary Johnson what was occurring. Vanita (Cheryl's mother) and Juanita Carter (Ashley's mother) also engaged in a verbal argument. While Cheryl was talking to the other people present, Ashley hit her, which prompted everyone to exit their vehicles and begin fighting. Cheryl explained that the victim and Mr. Williams exited their vehicle when Mary was fighting Lucilla (the victim's sister). Cheryl agreed that Mr. McKinley entered the fight after the victim attempted to intervene in the fight between Lucilla and Mary (Mr. McKinley's mother). Cheryl stated that the victim and Mr. McKinley then began to fight one another. Cheryl asserted that she saw appellant Taylor holding a silver and black gun. Cheryl also stated that there was something covering appellant Taylor's face when she saw him and that it was possibly a hat that was obscuring his face. Cheryl explained that appellant Taylor removed the obstruction as he fled the scene of the shooting so that she saw his face clearly. Cheryl did not see anyone except appellant Taylor with a weapon on the day of the shooting.

Stefanie testified that she was twenty years old at the time of trial, which would have made her a minor at the time of the shooting. Stefanie stated that in October 2010, she knew all three of the men on trial. On October 20, 2010, Stefanie, Eisha, Makala, and Cheryl were all on McMillan Street when an argument began with Ronisha because Stefanie was accused of taking a camera from someone's home. Stefanie explained that she stayed inside of the house until her stepmother, Vanita, arrived. Vanita, Cheryl, and Stefanie attempted to leave; however, when Ms. Trezevant (Stefanie's sister) arrived, Vanita returned to inform Ms. Trezevant that Cheryl and Stefanie were with her. Upon returning, the women exited the car, and Ashley hit Cheryl. A fight among multiple individuals ensued. Stefanie recalled that the victim attempted to break up a fight in which his sister Lucilla was involved. Stefanie testified that she was trying to help her sister, who was eight months pregnant, fight one of the combatants when she heard approximately five gunshots. Stefanie explained that she and her sister got down and that

when she looked up, she saw appellant Taylor shooting the victim, who was lying on the ground. Stefanie did not see anyone else shooting or holding a gun.

During cross-examination, Stefanie stated that Ms. Trezevant, Lucilla, the victim, Mr. Williams, and Shanna all arrived at the scene together. Stefanie explained that as her family was attempting to leave the area, Mary Johnson, the mother of the girls who wanted to fight Stefanie, arrived and pulled in front of Vanita's vehicle, blocking the road in front of them. Mary exited the vehicle and wanted to speak to Stefanie. The fight ensued after Ashley hit Cheryl. Stefanie agreed that in her statement to police, she said that the victim was standing when she looked up after the shots were fired and that the victim was standing in the area in which appellant Taylor was shooting, not that appellant Taylor aimed at the victim. Stefanie denied that people "scattered" when the shooting began.

Jarquez McKinley testified he knew all three of the men on trial from seeing them in his neighborhood. However, Mr. McKinley could not remember the events of October 20, 2010, and could not remember giving the police a statement regarding the incident. Mr. McKinley blamed his lapse of memory on his alcoholism. He also asserted that the initials and signatures on his police statement and his advice to witness a photographic lineup form were not made by him. Mr. McKinley was also unable to remember writing on or signing any photographic identifications.

The court conducted a jury-out hearing to determine if Detective Robert Wilkie could testify regarding Mr. McKinley's prior police statement. Detective Wilkie testified that prior to taking Mr. McKinley's statement, Mr. McKinley told him that he had consumed alcohol that evening. However, Detective Wilkie asserted that Mr. McKinley appeared to understand what was occurring and did not appear to be intoxicated. Initially, Mr. McKinley told Detective Wilkie varying versions of the shooting, but after being confronted with information from other witnesses, Mr. McKinley finally stated that he had fought with the victim and that appellant Wilson had shot the victim. Detective Wilkie stated that Mr. McKinley either initialed or signed his advice of rights form, his police statement, his advice to witness form, and his photographic identifications of appellants Taylor and Wilson. Detective Wilkie agreed that he could not testify as to the veracity of Mr. McKinley's statement.

Following the jury-out hearing, the trial court allowed Detective Wilkie to testify similarly before the jury and allowed into evidence a redacted version of Mr. McKinley's police statement, the two photographic identifications of appellants Taylor and Wilson, and the advice to witness form. In the redacted version of Mr. McKinley's statement, Mr. McKinley explained that he was at a liquor store when someone informed him that his mother was involved in a fight on McMillan Street. When Mr. McKinley arrived at the scene, he saw a man who had been shot running into a house. Someone told Mr.

McKinley that the victim had hit Mr. McKinley's mother, so Mr. McKinley attacked the victim. During the fight, Mr. McKinley heard gunshots, and the victim fell to the ground. Mr. McKinley asserted that appellant Wilson walked up to the victim and shot the victim five or six times. Mr. McKinley then fled the scene. In Mr. McKinley's photographic identifications, he stated that appellant Wilson shot the victim and that appellant Taylor was also shot at the scene.

Chris Williams testified that in October 2010, she lived near McMillan Street. She explained that she had heard of the three men on trial but that she did not know them personally. On October 20, 2010, Ms. Williams was standing on the corner of McMillan Street and a cross street when she saw a large group of people fighting in the street. Ms. Williams then heard gunshots from more than one gun, although she could not determine how many guns were fired. Initially, Ms. Williams asserted that she did not remember seeing the shooters. However, after being confronted with her police statement in which she told law enforcement that appellant Taylor was responsible for the victim's death, Ms. Williams testified that she remembered seeing appellant Taylor shoot the victim. Ms. Williams also recalled shots being fired toward another male as he ran away. Ms. Williams stated that she was unsure if the information in her statement to police was correct because she was intoxicated by drugs and alcohol when she witnessed the shooting. Ms. Williams further asserted that she had "totally blocked [the shooting] out" and therefore did not remember what occurred. The State entered as evidence Ms. Williams' identification of appellant Taylor on which Ms. Williams wrote, "This is Woo [appellant Taylor], number 2. I seen [sic] him fighting and shooting the guy." Although Ms. Williams did not remember making the statement, she agreed that she would not have lied when she told police that "'Ant [appellant Wilson] was shooting at the boy running.'"

During cross-examination, Ms. Williams testified that when she was using illegal drugs, she used marijuana, "X pills," and cocaine. Ms. Williams denied abusing alcohol. She agreed that her memories from the shooting were suspect due to her illegal drug use and that she was second-guessing her memories and assertions from that time. Ms. Williams also asserted that due to her drug use, there were gaps of time that she was unable to recall. She said there were some things in her statement she knew were false. Ms. Williams stated that she was sure that she saw appellant Taylor at the fight but that she was unsure of what she saw him doing during and after the fight. Ms. Williams explained that when the shooting began, she hid behind her car and that her primary concern was her safety. Ms. Williams stated that co-defendant Robinson was not the same "Tiny" whom she saw at the crime scene.

In a jury-out hearing, MPD Lieutenant Anthony Mullins testified that on October 20, 2010, Ms. Williams called the police department and stated that she had witnessed the shooting. About two hours after the shooting, Lieutenant Mullins met Ms. Williams,

-8-

picked her up, and took her to the police station to give a statement. Lieutenant Mullins described Ms. Williams as seeming "a little scared and nervous" but otherwise unimpaired. Lieutenant Mullins did not smell the residual odor of used narcotics. Ms. Williams was responsive and able to relay information to Lieutenant Mullins. Lieutenant Mullins stated that Ms. Williams reviewed, initialed, and signed her statement.

Following the jury-out hearing, the trial court allowed Lieutenant Mullins to testify similarly before the jury and allowed into evidence a redacted version of Ms. Williams' police statement. In Ms. Williams' statement, she stated that "Woo" (appellant Taylor) was responsible for the victim's death and that she saw two other shooters, one of whom she identified as "Tiny." She explained that prior to the shooting, appellant Taylor started complaining about being hit too hard during the fight with the victim and that appellant Taylor walked to his white Impala and retrieved his gun. She stated that appellant Taylor shot the victim four times while the victim was lying on the ground. Ms. Williams stated appellant Taylor and "Tiny" then shot from "opposite directions" at a second male who was with the victim. Ms. Williams then heard appellant Taylor say, "'I'm hit.'" During cross-examination, Lieutenant Mullins stated that he had no specific memory of asking Ms. Williams if she was intoxicated when she provided her statement and conceded that powder cocaine and ecstasy do not have a strong odor. Lieutenant Mullins explained that he showed Ms. Williams a photographic array that included co-defendant Robinson and that Ms. Williams said that she knew co-defendant Robinson as "Tiny" but that he was not the same person she saw at the shooting. Ms. Williams then identified appellant Wilson as the second shooter.

MPD Officer Paris Glass testified that she went to McMillan Street in response to a report of a shooting. When she arrived at the scene, Officer Glass saw a group of fifty to sixty people, and several males were fighting. When Officer Glass stopped near the fight, many people began to flee the area, and Officer Glass saw a male who had been shot lying in the street. The victim was responsive to Officer Glass but was unable to verbally communicate with her. Once other officers arrived, Officer Glass went into a nearby home based on information that there was another male gunshot victim inside. She found Julian Williams inside the house suffering from a gunshot wound to the leg. Officer Glass did not hear any gunshots while she was at the scene. During cross-examination, Officer Glass testified that after she arrived and a number of people fled from the area, there were approximately thirty people left at the crime scene. Officer Glass also agreed that when she talked to Mr. Williams, he was uncooperative and that he was unsure who had shot him.

Dr. Marco Ross, the Deputy Chief Medical Examiner for Shelby County, testified that he was a forensic pathologist and that he performed the autopsy on the deceased victim on October 21, 2010. Dr. Ross stated that the victim suffered nine gunshot wounds. One bullet entered the victim's left lower back and went through the left hip

bone, the left internal iliac artery, the tissue near the colon, and the bladder. The bullet came to rest in the victim's inner left thigh. A second bullet entered the victim's right buttock and exited the right buttock. A third bullet entered and exited from the left buttock. Dr. Ross speculated that the third bullet wound might be a reentry and exit of the second bullet. A fourth bullet entered the right buttock, exited and reentered the perineum, and lodged in the victim's outer left thigh. A fifth bullet entered and exited the victim's right thigh. A sixth bullet entered the victim's inner right knee and traveled up the victim's thigh to lodge in tissue in front of the victim's right hip. A seventh bullet entered the right forearm and exited the right wrist. An eighth bullet entered and lodged in the victim's right elbow, which Dr. Ross said was consistent with someone trying to cover their face. A ninth bullet entered the victim's left forearm. The victim also suffered numerous other abrasions.

Dr. Ross collected several bullets and bullet fragments that remained in the victim's body. Toxicology testing revealed that the victim had used marijuana prior to the shooting. Dr. Ross opined that based on the amount of marijuana byproducts found in the victim's system, the victim's level of impairment depended on how frequently the victim had used marijuana in the past. Dr. Ross said that if the victim had been a first time or infrequent user, the victim may have been impaired; however, if the victim was a habitual user, the victim may not have been impaired. Dr. Ross explained that due to the damage to the victim's iliac artery, approximately one liter of blood was found in the victim's abdomen, which could have led to the onset of shock. Dr. Ross said that the victim died as a result of the multiple gunshot wounds.

During cross-examination, Dr. Ross explained that the iliac artery was approximately the size of a pinkie or ring finger. He agreed that the victim was not shot in the head or upper torso where the likelihood of death was much higher than injuries to the extremities. Dr. Ross testified that the location of the shooter and the bullet trajectories depended on how the victim was positioned when the shots entered his body. Dr. Ross agreed that if the seventh bullet wound had been sustained while the victim's arm covered his face or chest, the victim would most likely have had a corresponding wound matching the exit wound for that injury and that it was possible that the eighth and ninth bullet wounds were sustained while the victim held a gun up. He also agreed that when each bullet wound was considered independently, the bullet striking the iliac artery was the most lethal but that some of the other wounds would have required immediate treatment to be survivable. However, Dr. Ross clarified that it was the combined effect of the multiple gunshot wounds that lead to the victim's death. Dr. Ross explained that it was the victim's extensive bleeding that caused him to go into cardiac arrest, which ultimately killed him.

Pier testified that he was eighteen at the time of trial and that he was fourteen in October 2010. He admitted that he had a prior juvenile conviction for aggravated

robbery. Pier testified that when questioned about the events of October 20, 2010, he told officers that he had been playing basketball when he saw a group of females begin fighting. However, Pier asserted that he left the scene before the shooting and that he did not know who was responsible for the death of the victim. He explained that he was on a different street with a friend, Jonathan Ford, when the shooting occurred. Pier asserted that he did not remember telling law enforcement that co-defendant Robinson and "Rambo" had guns so that they could rob someone at the scene of the fight and that he did not remember the events that he recounted in his statement. Throughout his testimony, Pier alternatively agreed that co-defendant Robinson, "Rambo," and appellant Taylor were at the scene of the fight, denied that they were present, and then asserted that he could not remember. When presented with his statement to police, Pier agreed that the initials on the first page and the signature on the last page belonged to him but asserted that the initials on the second page were not his. When presented with photographic arrays, Pier stated that he could not remember identifying anyone or signing the documents but then agreed that the signatures were his own.

During cross-examination, Pier agreed that he knew appellant Taylor from the neighborhood and that he saw appellant Taylor at the scene of the fight. However, Pier asserted that appellant Taylor was only watching and that he did not see appellant Taylor with a gun. Pier agreed that there were a lot of people watching the women fight. He did not recall seeing appellant Wilson or co-defendant Robinson at the scene of the fight. Pier did not remember telling the police that the only reason he was talking to them was because co-defendant Robinson had been in an altercation with Pier's cousin. Pier asserted that he saw co-defendant Robinson at the fight but that he did not see co-defendant Robinson with a gun.

In a jury-out hearing, Detective Robert Wilkie testified that he interviewed Pier on October 21, 2010. Detective Wilkie explained that Pier volunteered the information about the shooting and that he was cooperative during the interview. Detective Wilkie saw Pier initial and sign his police statement and advice to witness form. Detective Wilkie testified that Pier identified three people in photographic arrays and that Pier initialed and signed the identifications. Detective Wilkie conceded that Pier told him that the only reason he was speaking to the detective was because co-defendant Robinson and Pier's cousin had gotten into an altercation about one week before the interview.

Following the jury-out hearing, the trial court allowed Detective Wilkie to testify similarly before the jury and allowed into evidence Pier's witness statement, the advice to witness form, and three photographic arrays, two of which identified co-defendant Robinson and appellant Taylor. In his statement, Pier explained that he and another male were playing basketball when a group of females walked by discussing a forthcoming fight. Pier and his friend went to watch the fight and saw multiple other people arrive at the scene. Pier then heard "Tiny" say that one of the males at the scene had money and

-11-

that "they" should rob the other man. Pier explained that "Rambo started pulling on his pants where his gun usually [was], and then Tiny pulled out a .38 revolver from his pants." Pier heard "Tiny" say, "'You know how we get down, no fighting. Strictly shooting.'" Pier and his friend then left the scene. Shortly thereafter, they heard gunshots. Pier asserted that he only saw "Tiny" and "Rambo" with guns. Pier also told Detective Wilkie that he saw "Rambo, Tiny, Woo, Ant, Marquis, Pig, Dman[,] . . . Whitey[,] and Nunu" at the scene of the fight. During cross-examination, Detective Wilkie agreed that Pier never saw appellant Taylor with a gun and that he only saw appellant Taylor watching the fight. Detective Wilkie also conceded that the prior altercation between Pier's cousin and co-defendant Robinson was a motive for Pier to lie about co-defendant Robinson's involvement in the shooting.

Julian Williams testified he had two prior felony convictions — a drug-related offense and a robbery. He stated that in October 2010, he was friends with the victim but that he did not know appellants Taylor or Wilson. Mr. Williams explained that on October 20, 2010, he, the victim, and Ms. Trezevant drove to McMillan Street in a Lexus in response to a telephone call. Mr. Williams asserted that no one in his group had a weapon. When Mr. Williams arrived, he observed a group of forty to fifty people of various ages and both genders arguing. He did not know any of the people on the opposing side of the argument. A physical altercation ensued, and Mr. Williams saw the victim intercede in a fight involving Lucilla. Mr. Williams attempted to help the victim fight the other males involved and became embroiled in the altercation as well. During the fight, the victim's glasses broke, disrupting the victim's vision. Mr. Williams stated that he grabbed the victim and attempted to flee the area. However, males exited a car and began shooting multiple times. After the shooting began, Mr. Williams ran until he collapsed on someone's porch. He did not know that he had suffered multiple gunshot wounds until the homeowners allowed him inside and began caring for his injuries. Mr. Williams was shot once in the arm and twice in the legs. Mr. Williams also identified appellant Wilson[4] and co-defendant Robinson as two of the shooters.

During cross-examination, Mr. Williams agreed that initially the victim tried to remove Lucilla from the fight but that in the attempt, the victim became involved in the fight himself. Mr. Williams explained that two or three male shooters exited a light-colored car. He agreed that he did not recognize appellant Taylor as one of the shooters. Mr. Williams conceded that he did not know how many guns were used during the shooting and that he was afraid after the shooting began. Mr. Williams remembered the police being at the scene after the shooting, but he did not remember talking to the police

---

[4] While the transcript is unclear which appellant Mr. Williams identified, later testimony revealed that Mr. Williams initially made an in-court identification of appellant Taylor but then later stated that he was mistaken and identified appellant Wilson in-court. A review of the photographic arrays in the technical record, which were also introduced at trial, reveals that Mr. Williams identified appellant Wilson.

about the shooting because he was "in shock" and "panicking." Mr. Williams asserted that he saw the shooters' faces before they opened fire and that he saw a silver gun pointed at him. Mr. Williams conceded that he had not seen co-defendant Robinson's face as clearly as he had seen appellant Wilson's face during the shooting; therefore, he was not as certain about that identification. During redirect examination, Mr. Williams explained that co-defendant Robinson was the individual who had hit him in the face during that fight and that after hitting him, co-defendant Robinson ran to the men in the car, which was when the shooting began. Mr. Williams explained that he saw co-defendant Robinson run back to the car, which was the only reason he was able to see the shooters before the gunfire began.

MPD Officer John Stone testified that in October 2010, he was a crime scene investigator and that he responded to the shooting on McMillan Street. He explained that both he and another crime scene investigator divided the responsibilities at the crime scene and that he was charged with doing all relevant sketches and measurements. Among the items sketched were nine millimeter Luger casings and .40 caliber casings. Numerous pictures of the crime scene and the home where Mr. Williams was found were also entered as exhibits.

Tennessee Bureau of Investigation ("TBI") Special Agent Cervinia Braswell testified that she was assigned as a forensic scientist in the Firearms Identification Unit. In the course of her duties, Special Agent Braswell examined multiple bullets and cartridges. Based on her analysis of nine millimeter cartridges, .40 caliber cartridges and bullets, and .38/.357 bullets found at the scene and in the victim, Special Agent Braswell concluded that three weapons were used to kill the victim but that there were four to five weapons used during the incident. Special Agent Braswell conceded that she did not know if the nine millimeter cartridges were actually fired during the October 2010 incident or if they were present from a prior incident. Following this testimony, the State rested its case-in-chief.

Appellant Taylor's first witness was Brittney, who was eighteen at the time of trial but was sixteen on October 20, 2010. Brittney explained that on October 20, 2010, she received a telephone call from her younger sister Ashley, who told her that Stefanie and Cheryl had "pull[ed] up on them" due to a prior altercation regarding a stolen camera. In response to the telephone call, Brittney went to McMillan Street with two other females — Jasmine and Dominique. After arriving, Jasmine exited their car to speak to Ashley and Ronisha. In response, Stefanie and Cheryl ran into a house because they believed that Ashley, Ronisha, and Jasmine were going to begin a fight. Cheryl also called her cousin, Lucilla, to inform her of the potential for violence. Dominique and Jasmine soon left the area, leaving Brittney, Ronisha, and Ashley on McMillan Street. Approximately twenty minutes later, Mary Johnson arrived in her Hummer with Juanicia and Juanita to speak with Eisha, the homeowner of the house in which Stefanie and Cheryl were

located. After Mary and Eisha had spoken and as everyone was beginning to leave, Brittney saw a Lexus, an Impala, and a Mitsubishi stop near Eisha's home. Inside the vehicles, Brittney saw the victim, Lucilla, Shanna, Ms. Trezevant, an unknown male, Vanita, and Keosha (Stefanie's sister). When Vanita exited her car, she was angry and refused to speak with Mary, and Keosha's car was blocking Mary's departure. An argument then ensued between Juanita, Vanita, Cheryl, and Ashley. Ashley hit Cheryl, which caused a fight to begin between multiple parties. Brittney then picked up a baby, who was in her care, and watched the fight.

During the fight, Brittney saw Ms. Trezevant holding a silver tire iron. Brittney estimated that the fight continued for approximately five minutes before any males joined the fray. The victim entered the fight and hit Juanita in the back of the head when he thought that Juanita was attacking Lucilla (his sister). Brittney asserted that the victim then went to other fights, grabbed both Juanicia and Holly by their hair, and punched them both in the face. Thereafter, other males joined the fight. Brittney heard Vanita yell, "'Pop the trunk.'" Brittney believed that shooting was about to begin, so she took the children present behind her mother's truck on a hill. Brittney asserted that she saw the victim with a black gun. Brittney heard one gunshot and heard appellant Taylor say, "'D***, I'm shot.'" Brittney heard another shot, which hit the tire of a vehicle near her. Brittney saw the other male who had arrived with the victim run into a nearby duplex and saw the children inside the house fighting with the male. Brittney then observed the victim "turned sideways" scooting from the street toward her. She asserted that the victim was not wearing a shirt or pants, that his boxers were askew, and that he was only wearing one sock. She then saw someone in a cream-colored shirt shoot the victim, and she took the children and ran. Brittney asserted that appellant Taylor was not the shooter she saw and that she did not see appellant Taylor after hearing him say that he had been shot. Brittney stated that she was approximately six feet from the victim when he was shot.

During cross-examination, Brittney asserted that she never saw co-defendant Robinson. Brittney estimated that there were approximately thirty people at the scene of the fight. Brittney conceded that she was hiding behind her mother's vehicle from the time the shooting began until after the shooting was over and that she was unable to see what occurred during that time. Brittney asserted that in October 2010, she only knew of appellant Taylor and co-defendant Robinson but did not know them personally. She stated that she did not know appellant Wilson but that she knew appellant Wilson's girlfriend. She explained that she had seen the victim several times but that they had never spoken. Brittney conceded that she was unable to identify the victim's shooter during her interview after the shooting. She asserted that she did not tell law enforcement that the victim had a gun because she was never asked. She stated that she did not see anyone besides the victim with a gun because her view was obstructed due to her hiding behind her mother's vehicle.

During re-direct examination, Brittney testified that after the first gunshot, she saw appellant Taylor holding a gun but that prior to that, she had only seen the victim holding a gun. Brittney also said she saw the gun that shot the victim. Brittney said that when she saw the victim scooting on the ground, the victim may have already been shot but that she did not see any blood. Brittney asserted that she was one hundred percent sure that appellant Taylor did not shoot the victim. She said that the victim's shooter "had facial hair, [was] bright-skinned, [and wore a] cream shirt." She said that the shooter also had "small dreds" that were close to his head and that he had a silver gun. During re-cross examination, Brittney conceded that she had never given that description to law enforcement and that in court was the first time she had ever given anyone that description of the shooter.

Appellant Taylor called Juanita Carter as his second witness. Juanita explained that on October 20, 2010, when she was about to leave from work, she received a telephone call that her daughter, Ashley, was on McMillan Street because Ashley and Juanicia Johnson had gotten into an altercation with Stefanie. Juanita explained that she, Mary Johnson, and Juanicia Newsom went to McMillan Street in a burgundy Hummer. When she arrived, she and Mary began talking to Felicia (who had called her about the altercation) and Eisha. During the conversation, Juanita saw a black Impala pass them, drive to a nearby gas station, and then return with two other cars — a gold, four-door car and a white, "creamish" car — that blocked her vehicle's exit. Juanita asserted that Vanita drove the black car and that there were two males and three females in the gold car. Juanita explained that Mary Johnson exited the vehicle to talk to the people in the cars; however, the opposing group did not want to talk. Juanita asserted that one of the young girls had a small hammer that had a silver metal head and a wooden handle. Juanita stated that Mary pleaded with the victim to leave but that Vanita was agitated and yelling, "'We didn't come over here to talk,'" which Juanita believed meant that Vanita wanted to fight. The fight broke out when Ashley hit Cheryl, which caused the other women to participate in the fight. During the fight, Juanita felt an unknown male pulling her and saw Holly Blueitt grab the male from behind. When that occurred, the male turned and hit Ms. Blueitt, and a fight ensued. Juanita also saw the victim fighting with Juanicia and saw appellant Taylor pull the victim from Juanicia. During the fight, Juanita heard a gunshot, and everyone began to run from the area. Juanita also heard appellant Taylor say, "'Oh,'" and she began yelling that appellant Taylor had been shot. Juanita saw appellant Taylor run away, and then she fled the area, eventually reentering her Hummer, which had a flat tire, and drove to a nearby street. Juanita asserted that she never saw anyone with a gun; she merely heard the shots. Juanita stated that she heard more than five gunshots during the incident. Juanita stated that she never saw appellant Taylor possess a gun or shoot anyone.

Appellant Taylor's next witness was Ashley Carter. Ashley testified that she was with Ronisha Johnson on McMillan Street when Ronisha and Stefanie became involved

-15-

in an argument over a stolen camera. Due to the argument, several other people arrived at the scene, including Cheryl's mother (Vanita), Ashley's mother (Juanita), and Ashley's aunt (Mary). The adult women were talking about the situation when a vehicle pulled in behind Mary's vehicle. The physical altercation began when Vanita and Juanita got into an argument in which Cheryl tried to intervene. During the fight, Ashley saw men enter the fight and saw Stefanie and Ronisha fighting. Ashley explained that she was fighting with Cheryl and Lucilla when she heard the first gunshot, which caused her to run from the scene. Ashley asserted that she did not see who fired the shot because a Hummer was blocking her view. During re-direct examination, Ashley asserted that during the fight, she saw the victim and another male fighting with Ms. Blueitt and Mary and that the males were pulling the women's hair and hitting the women.

During recross-examination, Ashley agreed that the victim and his friend were not the only males involved in the fight. Ashley also agreed that her cousin, Holly Blueitt, had a child with a family member of appellant Taylor and that Ms. Blueitt had a child with a family member of co-defendant Robinson.

Appellant Taylor's next witness was Dierrdre Taylor. Mr. Taylor testified that he is appellant Taylor's brother and that he was with appellant Taylor on October 20, 2010, walking in their neighborhood when they saw Mary Johnson's vehicle parked in the middle of McMillan Street. Inside the vehicle were Mary and Juanita Carter. As the two men were walking up McMillan Street, Mr. Taylor saw a black Impala, a "brown goldish" Taurus, and a white Mitsubishi pass them. He saw the cars drive to a gas station, turn around, and then return to surround Mary's vehicle. Mr. Taylor saw the women exit their cars and saw Vanita act in an aggressive manner toward the other women. Mr. Taylor explained that there were essentially two groups of people facing each other in the street. Cheryl indicated that Vanita should fight with Juanita. However, Ashley intervened and began the physical altercation by attacking Cheryl. Mr. Taylor stated that all the women then began to fight. Mr. Taylor estimated that the combination of fighters and observers totaled approximately seventy-five people at the scene. Mr. Taylor explained that he, appellant Taylor, the victim, and Julian Williams[5] watched the fight from Eisha's porch. During the fight, Mr. Taylor saw the victim jump from the porch and grab "Nene" Newsome by her hair to stop Ms. Newsome from hitting another female. The victim then hit Ms. Newsome in the face twice. Mr. Taylor explained that after seeing this, his brother intervened in the victim's and Ms. Newsome's fight, which caused the victim to begin fighting with appellant Taylor. Mr. Taylor explained that he entered the fight when he saw Mr. Williams begin fighting appellant Taylor also. Mr. Taylor saw other males join the fight. Mr. Taylor asserted that he and appellant Taylor

---

[5] While Mr. Taylor only referred to Mr. Williams as a "bright-skinned" male with the victim during direct examination, it is clear from cross-examination that he was referring to Mr. Williams.

only entered the fight to stop the victim from hitting Ms. Newsome. During the fight, Mr. Taylor heard a gunshot and heard his brother say, "'Oh, they shot me. They shot me, bro.'" Mr. Taylor then looked up and saw the victim holding a black and silver gun. The two brothers ran from the scene after appellant Taylor was shot, but they got separated. As he was running, Mr. Taylor heard multiple gunshots and hid behind a house until the gunshots stopped. Mr. Taylor explained that he knew the additional gunshots were fired from multiple weapons because the sounds of the gunshots were different. He stated that after the gunshots stopped, he returned to the scene to look for his brother. Mr. Taylor then saw the victim lying sideways on a curb wounded. Mr. Taylor saw the victim's family members and Mary Johnson attempting to help the victim before he left the scene. Mr. Taylor agreed that he never actually saw anyone shoot a gun and that he never saw his brother with a gun at the scene of the shooting.

During cross-examination, Mr. Taylor agreed that he was called "Rambo." He also agreed that at the time of the shooting, he knew both appellant Wilson and Jarquez McKinley. Co-defendant Robinson is Mr. Taylor's cousin. Mr. Taylor stated that after he began running following the initial gunshot during the fight, he had not run far when he heard the next series of gunshots. However, his view was obstructed by the house behind which he was hiding, and he did not see who was shooting or observe the victim's movements immediately after the shooting. Mr. Taylor agreed that in the three years between the shooting and the trial, he had never told law enforcement or the district attorney's office his version of events.

During re-direct examination, Mr. Taylor agreed that law enforcement had never contacted him regarding the shooting. He asserted that appellant Taylor intervened in Ms. Newsome's and the victim's fight to protect Ms. Newsome but that appellant Taylor never retaliated against the victim after appellant Taylor was shot at the scene. Mr. Taylor stated that at the time of the shooting, appellant Taylor had long hair.

Mary Johnson testified that on October 20, 2010, she received a telephone call in the morning from Vanita, telling her that no one was going to "f*** with Steffi." When Mary tried to calm the conversation, Vanita ended the call. Later that day, as Mary was leaving work, she received another telephone call informing her that her daughters Jasmine Johnson and Chastity Johnson were located on McMillan Street and were about to get into a fight with another female. When Mary arrived, her two daughters had already left, and Mary apologized to Eisha (the homeowner) for the trouble that her daughters had caused. As Mary was about to leave, a black Impala, a tan car, and a white car stopped near Mary's vehicle, blocking her in. Inside Mary's vehicle sat Juanita Carter and Juanicia Newsom. Vanita was inside one of the cars, and Mary tried to explain that the issue had been resolved. However, Vanita was hostile in response, indicating that she wanted to fight. When Ashley and Ronisha walked up, the two girls entered Mary's vehicle. Mary attempted to talk to the victim and Lucilla because she

knew them through her children. Mary explained that she hugged both Lucilla and the victim and that when she hugged the victim, she felt "something hard . . . like a gun." Mary explained that Juanita Carter became angry because their exit was blocked, and Juanita exited the car. Mary stated that everyone started "talking smart." Mary asserted that Lucilla began the fight by hitting Juanita and that, thereafter, everyone began fighting. Mary estimated that twenty to twenty-five people were involved in the fight. Mary explained that during the fight, she was trying to protect Keosha, who was seven or eight months pregnant at the time. Mary also tried to stop her daughter Ronisha from fighting with Stefanie. Mary saw a female on the opposing side walking around with a pipe in her hand. Mary heard a series of "pow" sounds and turned to see the victim holding a gun by his side while appellant Taylor and another male hit him. Mary stated that everyone continued to fight and that Lucilla asked her to help the victim.

When Mary got to the victim, the victim was on his side sliding up on the curb. Mary said the victim eventually "looked like he was dead" and that he was not moving or talking. Mary explained that the victim was not wearing a shirt and that his jeans were "at the bottom of his knees." Mary said that her son Brandon walked up and said, "'I told you, I told you, bro, not to come over here. I told you don't get in there involved in this girl fight. Now look, bro.'" After her son moved away, Mary heard appellant Taylor say that he had been shot also and saw appellant Taylor run away. Vanita then approached the victim and retrieved two guns that were lying by the victim — a silver gun with a black handle and another silver gun. Vanita, Cheryl, and "Dman" then left the scene. While Mary was with the victim, her son Jarquez attempted to hit the victim with a green garbage can and kicked the victim. Mary explained that Jarquez was extremely intoxicated and that he believed the victim was attempting to hurt her. Mary did not see appellant Taylor with a gun and did not see anyone actually fire a gun. She only heard the gunfire.

During cross-examination, Mary explained that she arrived at the scene of the shooting in her burgundy Hummer but that Juanita Carter was driving the vehicle. Mary could not remember if she told law enforcement that Vanita retrieved two guns from near the victim after the shooting or if she told police that she felt a gun when she hugged the victim. Mary conceded that she did not tell law enforcement that the victim had a gun in his hand during the fight. When presented with her police statement, Mary conceded that the prior three assertions were not included in her statement and that it did not include information about Vanita wanting to fight or about Jarquez hitting the victim. During re-direct examination, Mary asserted that she told the officer who took her statement information that he did not include in the printed draft of her statement.

Co-defendant Robinson's first witness was MPD Lieutenant James Max. Lieutenant Max testified that he was the case coordinator for the October 20, 2010 shooting. Lieutenant Max provided the respective dates in which each of the co-

defendants was charged regarding the shooting: appellant Taylor, October 22, 2010; appellant Wilson, October 28, 2010; and co-defendant Robinson, March or April 2013.

During cross-examination, Lieutenant Max agreed that he talked to many people during the course of his investigation. Lieutenant Max explained that on the night of the shooting, he spoke to Tony Moss, a male found near the scene of the shooting with a .40 caliber pistol. However, Mr. Moss was released without charges because there was no further evidence that he was involved in the shooting. Lieutenant Max agreed that he did not have the gunshot residue kit taken from the victim tested and explained that gunshot residue tests are rarely conclusive. Lieutenant Max agreed that Tony Moss, Trichuna Butler, Julian Williams, and Brittney did not identify appellant Taylor as the shooter. Lieutenant Max stated that Brittney never told him that the victim had a gun prior to the shooting. Lieutenant Max agreed that he waited to charge co-defendant Robinson until after the victim's autopsy and firearms testing were complete so that he could see if the information matched Julian Williams' and Pier's assertions that co-defendant Robinson was involved in the shooting.

Co-defendant Robinson's next witness was Jason Powell, a private investigator hired on behalf of co-defendant Robinson. Mr. Powell explained that during the course of his investigation, he spoke with Julian Williams. Mr. Williams told Mr. Powell that he never saw the shooters due to the speed at which events occurred and that he did not recognize co-defendant Robinson.

Following this testimony, the jury convicted appellants Taylor and Wilson as charged and found co-defendant Robinson not guilty on all counts. Due to an error in the jury instructions and due to the jury's not following a jury instruction, the trial court dismissed all the counts of employing a firearm during the commission of a dangerous felony. Therefore, appellants Taylor and Wilson stand convicted of the first degree murder of the victim and the attempted first degree murder of Julian Williams. The trial court sentenced appellant Taylor to life for his first degree murder conviction and to twenty years for his attempted first degree murder conviction, to be served consecutively, for a total effective sentence of life plus twenty years. The trial court sentenced appellant Wilson to life for his first degree murder conviction and to twenty years for his attempted first degree murder conviction, to be served concurrently, for a total effective sentence of life. Appellants Taylor and Wilson now challenge their convictions.

## II. Analysis

On appeal, appellant Taylor argues that: (1) the trial court erred in instructing the jury on criminal responsibility for the conduct of another; (2) the evidence was insufficient to support appellant's convictions; (3) the trial court erred in failing to instruct the jury on self-defense and defense of others; (4) the trial court erred in failing to

declare a mistrial after the State told the jury that appellant was in jail; (5) the trial court erred in admitting into evidence a close-up autopsy photograph of the victim's face; (6) the trial court erred in admitting Chris Williams' statement as substantive evidence pursuant to Tennessee Rule of Evidence 803(26); (7) there was cumulative error that requires reversal; and (8) the trial court erred in aligning appellant's sentences consecutively. Appellant Wilson argues that the trial court erred in failing to grant his Motion for Acquittal because the proof at trial was inconsistent and insufficient and also erred in admitting into evidence Jarquez McKinley's police statement as substantive evidence pursuant to Tennessee Rule of Evidence 803(26).

## A. Criminal Responsibility Jury Instruction

Appellant Taylor argues that criminal responsibility was not fairly raised by the evidence; therefore, the trial court erred in instructing the jury in that regard. "It is well-settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011) (citations omitted). It is the duty of the trial judge to properly instruct the jury as to the law governing the issues fairly raised by the evidence introduced at trial and the nature of the proceedings. *Id.* (quoting *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990)). On appeal, this court must determine if a given instruction is prejudicially erroneous, which occurs when the instruction "fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Vann,* 976 S.W.2d 93, 101 (Tenn. 1998) (citations omitted). The propriety of a given instruction is a mixed question of law and fact that we review de novo with no presumption of correctness. *State v. Smiley,* 38 S.W.3d 521, 524 (Tenn. 2001).

"A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Further, a person is criminally responsible for an offense committed by the conduct of another, if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" *Id*. § 39-11-402(2). While not a separate crime, criminal responsibility is a theory by which the State may alternatively establish guilt based on the conduct of another. *Dorantes*, 331 S.W.3d at 386 (citing *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)). No specific act or deed needs to be demonstrated by the State, and furthermore, the presence and companionship of an accused with the offender before and after the offense are circumstances from which participation in the crime may be inferred. *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). However, to be convicted, "the evidence must establish that the defendant in some way

knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386 (citing *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994)); *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)).

The trial court properly instructed the jury as to criminal responsibility in this case. The proof showed that the victim was shot nine times by three separate weapons. The victim sustained all of the injuries within a very short time period. Furthermore, Cheryl, Stefanie, Chris Williams, and Joycelyn Key all identified appellant Taylor as one of the shooters. While appellant Taylor challenges these witnesses' credibility, it is the province of the jury to resolve issues of credibility and determine the value of the evidence presented; as such, we will not reevaluate issues of credibility. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Appellant Wilson was also identified as one of the shooters, and Julian Williams saw appellant Wilson with co-defendant Robinson immediately prior to appellant Wilson opening fire. Based on all of this information, a theory of criminal responsibility was fairly raised by the proof presented at trial, and the trial court did not err in instructing the jury about criminal responsibility.

Even if we were to find that the trial court erred in giving the criminal responsibility instruction, the error was harmless because there was sufficient evidence that appellant Taylor was himself one of the gunmen, as established by the eye witnesses identifying appellant Taylor as a shooter, by the nine gunshot wounds suffered by the victim, and the three gunshots suffered by Mr. Williams. Therefore, any harm caused by giving the instruction was nullified and harmless. *See State v. Rickey Dickerson*, No. W2008-00301-CCA-R3-CD, 2009 WL 1219105, at *9 (Tenn. Crim. App. May 4, 2009) (citing Tenn. R. App. P. 36(b)). Appellant is not entitled to relief as to this issue.

### B. Sufficiency of the Evidence

Both appellant Taylor and appellant Wilson challenge the sufficiency of evidence supporting their convictions. Appellant Taylor argues that the State's witnesses were not credible and that there was insufficient evidence of premeditation. Appellant Wilson argues that the trial court erred in failing to grant his Motion for Acquittal because the proof at trial was inconsistent and the witnesses were not credible.

A motion for judgment of acquittal raises a question of law, i.e., the legal sufficiency of the evidence, for determination by the trial court. *State v. Adams*, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995) (citing *State v. Hall*, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983)). Thus, on appeal, this court applies the same standard of review both to the trial court's denial of a motion for a judgment of acquittal and to the sufficiency of the convicting evidence underlying the jury's verdict. *State v. Carroll*, 36 S.W.3d 854, 869 (Tenn. Crim. App. 1999) (citing *Ball*, 973 S.W.2d at 292).

-21-

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

The jury convicted appellants of premeditated murder and attempted premeditated murder. Tennessee Code Annotated section 39-13-202(a) defines this category of first degree murder as "[a] premeditated and intentional killing of another."

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was

-22-

sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* at § 39-13-202(d). In reviewing the sufficiency of the evidence, we must determine whether the State established the element of premeditation beyond a reasonable doubt. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). The presence of premeditation is a question of fact for the jury, and the jury may infer premeditation from the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *see State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998).

Viewed in the light most favorable to the State, the evidence at trial showed that appellants fired weapons during a large street fight, killing one person and wounding another. Cheryl, Stefanie, Chris Williams, and Joycelyn Key all identified appellant Taylor as one of the shooters. Jarquez McKinley, Chris Williams, and Julian Williams identified appellant Wilson as one of the shooters. While appellants challenge these witnesses' credibility, it is the province of the jury to resolve issues of credibility and determine the value of the evidence presented; as such, we will not reevaluate issues of credibility. *Bland*, 958 S.W.2d at 659. In addition to these eye witnesses claiming that appellants were active shooters at the scene, Ms. Key asserted that she saw two males shooting simultaneously into the crowd of people fighting. Ms. Williams explained that immediately prior to the shooting, she heard appellant Taylor complaining about the victim's hitting him too hard and that appellant Taylor then went and retrieved a gun from a car. In her statement to police, Ms. Williams stated that there were three shooters at the scene and that she saw appellant Taylor shoot the victim. She also saw appellant Taylor and another shooter fire at another male as the male ran from the scene. On her photographic identification of appellant Wilson, Ms. Williams wrote, "Ant shot at the boy running." The victim suffered nine gunshot wounds from three separate weapons, which resulted in his death. Julian Williams suffered three gunshot wounds. Dr. Ross clarified that it was the combined effect of the multiple gunshot wounds that lead to the victim's death. Dr. Ross explained that it was the victim's extensive bleeding that caused him to go into cardiac arrest, which ultimately killed him. Based on this evidence, a reasonable jury could have found that appellants were responsible for the death of the victim and for the injuries suffered by Mr. Williams.

Regarding appellant Taylor's assertions that the shootings were not premeditated, a defendant's "state of mind is crucial to the establishment of the elements of the offense;" thus, the State may prove premeditation by circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992). Several factors support the existence of premeditation including: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of

the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660 (citing *Brown*, 836 S.W.2d at 541-42; *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992)). However, these factors are not exhaustive and other information establishing "a motive for the killing and the nature of the killing are also factors from which the jury may infer premeditation." *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013) (citing *State v. Nesbit,* 978 S.W.2d 872, 898 (Tenn. 1998)). "Specifically, evidence of repeated blows is a relevant factor in determining premeditation, although this evidence alone would not be sufficient to establish premeditation." *Id.* (citing *Sims,* 45 S.W.3d at 8).

Viewed in the light most favorable to the State, the evidence at trial was sufficient to prove premeditation. Both Ms. Butler and Cheryl stated that the victim and Julian Williams were unarmed during the fight. Ms. Williams heard appellant Taylor complain about the victim's hitting him too hard and, subsequently, saw appellant Taylor retrieve a gun from a car. Mr. Williams saw appellant Wilson exit a car with a weapon and open fire. Furthermore, both victims suffered multiple gunshots. Therefore, there were multiple factors — the use of a deadly weapon upon an unarmed victim; evidence of procurement of a weapon; motive to kill; and multiple gunshot injuries — that supported a finding of premeditation.

Finally, we note that appellant Wilson makes a sub-argument that his Sixth Amendment rights were violated by the use of Mr. McKinley's and Ms. Williams' identifications. In support of this argument, appellant cites two cases that address the violation of a defendant's Sixth Amendment rights when denied the right of counsel during a corporeal line-up or identification. However, appellant Wilson does not argue that he was denied his right of counsel but, rather, argues that the identifications were unreliable due to Ms. Williams' and Mr. McKinley's substance abuse. Therefore, we conclude that appellant's argument as presented is meritless and inapposite to the issue at hand.

Based on the above analysis, after viewing the evidence in the light most favorable to the prosecution, a rational jury could have found the essential elements of first degree murder and attempted first degree murder beyond a reasonable doubt. Appellants are without relief as to this issue.

### C. Self-Defense and Defense of Others Jury Instruction

Appellant Taylor argues that the trial court erred by not instructing the jury about self-defense and defense of others. The State responds that appellant has waived this argument by withdrawing his request for the defense of others instruction at trial and that, alternatively, there was no proof justifying a self-defense instruction.

"It is well-settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *Dorantes*, 331 S.W.3d at 390 (citations omitted). It is the duty of the trial judge to properly instruct the jury as to the law governing the issues fairly raised by the evidence introduced at trial and the nature of the proceedings. *Id.* (quoting *Teel*, 793 S.W.2d at 249). On appeal, this court must determine if a given instruction is prejudicially erroneous, which occurs when the instruction "fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Vann,* 976 S.W.2d at 101 (citations omitted). The propriety of a given instruction is a mixed question of law and fact that we review de novo with no presumption of correctness. *Smiley,* 38 S.W.3d at 524.

At trial, appellant Taylor requested that the trial court instruct the jury regarding defense of others. The other two defendants did not request the instruction. During the discussion about the instruction, the trial court stated that defense of others incorporated the requirements for self-defense, that self-defense requires that the defendant be acting legally at the time self-defense was used, and that appellant Taylor was unlawfully in possession of a handgun at the time of the shooting. After further discussion, appellant Taylor withdrew his request for the instruction before the trial court could rule on whether the instruction would be included. However, appellant now reasserts that the trial court should have instructed the jury on self-defense or defense of others. This court addressed a similar situation in *State v. Schiefelbein* when a defendant affirmatively agreed with the trial court's decision regarding a jury instruction. 230 S.W.3d 88, 117 (Tenn. Crim. App. 2007). This court stated:

> On appeal, the defendant claims that the trial court's instruction was error. We decline the defendant's request for relief on this basis because he created his own predicament both by failing to object at the appropriate time and by inviting the court to do the very thing of which he now complains. *See* Tenn. R. App. P. 36(a). This court is loath to place a trial court in error when the party complaining on appeal failed to take corrective action with respect to any error which allegedly occurred below, and we are particularly loath to do so where the complaining party affirmatively acquiesced in the trial court's action. *See id.* (nothing in rule requires "relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). This issue is waived.

*Schiefelbein*, 230 S.W.3d at 117. While we note that normally an erroneous jury instruction can be raised for the first time in the motion for new trial, we agree with the logic and reasoning employed in *Schiefelbein*. Therefore, we find that by actively

-25-

withdrawing his motion for a defense of others instruction following a discussion about self-defense and defense of others, appellant Taylor has waived this issue on appeal.

## D. Mistrial – Appellant in Jail

Appellant Taylor argues that the trial court should have declared a mistrial after the State, when asking a witness a question, said that the defendants were in jail. Declaring a mistrial serves to repair the damage done to the judicial process when an occurrence at trial renders an impartial verdict impossible. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). A trial court may declare a mistrial if it appears that some matter has occurred that would prevent the jury from reaching an impartial verdict. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). A trial court should only declare a mistrial in criminal cases in which a manifest necessity requires such action. *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). A mistrial is appropriate "when a trial cannot continue or a miscarriage of justice would result if it did." *State v. McPherson*, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994).

This court will review the trial court's decision to grant or deny a mistrial for abuse of discretion. *See State v. Hall*, 976 S.W.2d 121, 147 (Tenn. 1998) (citing *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990)). In reviewing the trial court's decision granting or denying a mistrial for abuse of discretion, this court considers three factors: (1) whether the State elicited the testimony; (2) whether the trial court gave the jury a curative instruction; and (3) the relative strength or weakness of the State's proof. *State v. Welcome*, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007) (citing *State v. Lawrence Taylor*, No. W2002-00183-CCA-R3-CD, 2003 WL 402276, at *10 (Tenn. Crim. App. Feb. 14, 2003)). The party requesting the mistrial bears the burden of establishing the necessity for it. *Williams*, 929 S.W.2d at 388.

Appellant specifically challenges the following colloquy during the State's cross-examination of Brittney:

Q: All right. So, in your words what you told us today is Lyle King drew down first; is that right?

A: Yes.

Q: All right. And so here these three men are locked up for shooting Lyle King, right?

A: Yeah.

Q: They're on trial on trial for murder one, for shooting Lyle King and by your words, we've got three innocent men in jail who were just defending themselves and you've got this great information that Lyle King drew down first?

[Trial counsel objected and moved for a mistrial based on the prosecutor's statements that the defendants were in jail.]

. . . .

[Trial court]: Yeah. I'm not going to agree on a mistrial. I think they can still get a fair trial without that even with -- if the jury knows that, but I'll give a curative instruction if you want it or I cannot.

[Trial counsel]: What difference does it make now?

[Trial court]: That's a two-edged sword. I don't -- I'll leave the strategic decision to y'all.

. . . .

[Prosecutor to witness]: [Brittney], I'm going to rephrase my question. So, you've got this great information. These three men are charged with this crime and you just keep it to yourself; is that right?

A: Yeah.

Considering the three factors utilized in a mistrial analysis, we conclude that the first factor weighs in favor of appellant Taylor because the State was responsible for the inappropriate reference to appellant's incarceration. However, the second and third factors support the trial court's decision. The trial court offered to provide a curative instruction, but trial counsel did not want the instruction. While it was a legitimate trial strategy to prevent bringing appellant's incarceration to the jury's attention yet again, appellant is not then later entitled to relief for the failure of the trial court to offer a curative instruction. *See McPherson*, 882 S.W.2d at 371; *see also* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Also, as discussed *supra* subsection B, there were numerous eye witnesses that identified appellant Taylor as one of the shooters at the scene and both of the victims suffered multiple gunshot wounds. Therefore, the State had a plethora of incriminating evidence against appellant Taylor.

-27-

Finally, we note that while the State erred by mentioning appellant Taylor's incarceration, all three defendants were on trial for first degree murder, attempted first degree murder, and employing a firearm during the commission of a dangerous felony; therefore, given the severity of appellant's offenses, logic dictates that the jury "must know a person on trial is either on bail or in confinement during the course of a trial." *State v. Baker,* 751 S.W.2d 154, 164 (Tenn. Crim. App. 1987). Furthermore, "[t]his court has held that a prosecutor's brief reference regarding a defendant's incarceration 'hardly compares to a defendant's appearing in shackles before the jury.'" *State v. Paul Edward Corso, Jr.*, No. M2010-00782-CCA-R3-CD, 2011 WL 2848270, at *20 (Tenn. Crim. App. July 19, 2011) (citation omitted). Therefore, we conclude that petitioner was not prejudiced to the extent required to rise to the level of manifest necessity. The trial court did not abuse its discretion in denying appellant's motion for a mistrial, and appellant Taylor is not entitled to relief.

## E. Autopsy Photograph

Appellant Taylor argues the trial court erred in admitting an autopsy photograph of the left side of the victim's face. Tennessee Rules of Evidence 401, 402, and 403 govern the admissibility of the photograph in this case. *See State v. Banks*, 564 S.W.2d 947, 949-51 (Tenn. 1978). First, a witness with knowledge of the facts must verify and authenticate a photograph before it can be admitted into evidence. *Id.* at 949; Tenn. R. Evid. 901. Next, a trial court must determine whether the photograph is relevant. *Id.*; *see* Tenn. R. Evid. 401. Irrelevant evidence is inadmissible. Tenn. R. Evid. 402. If the evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," it is relevant. Tenn. R. Evid. 401. Once it determines that a photograph is relevant, the trial court must then determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 950-51. "Unfair prejudice" is "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Banks*, 564 S.W.2d at 951 (quoting Fed. R. Evid. 403, Adv. Comm. Note). Furthermore,

> A trial court should consider: the accuracy and clarity of the picture and its value as evidence; whether the picture depicts the body as it was found; the adequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a *prima facie* case of guilt or to rebut the defendant's contentions.

*State v. Leach*, 148 S.W.3d 42, app. 63 (Tenn. 2004) (citing *Banks*, 564 S.W.2d at 951).

The decision whether to admit the photograph rests within the trial court's sound discretion, and we will not reverse the trial court's determination absent a clear showing of an abuse of that discretion. *Banks*, 564 S.W.2d at 949; *see also State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Stinnett*, 958 S.W.2d 329, 331 (Tenn. 1997); *State v. Dickerson*, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993). Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases. *See Banks*, 564 S.W.2d at 949.

"Graphic, gruesome, or even horrifying photographs of crime victims may be admitted into evidence if they are relevant to some issues at trial and probative value is not outweighed by their prejudicial effect." *State v. Brock*, 327 S.W.3d 645, 694 (Tenn. Crim. App. 2009) (citing *Banks*, 564 S.W.2d at 949-51); *see State v. Curtis Scott Harper*, No. E2014-01077-CCA-R3-CD, 2015 WL 6736747, at *14 (Tenn. Crim. App. Nov. 3, 2015) (citations omitted). Autopsy photographs must never be used "solely to inflame the jury and prejudice them against the defendant" and must be relevant to prove some material aspect of the case. *Banks*, 564 S.W.2d at 951 (citing *Milam v. Commonwealth*, 275 S.W.2d 921 (Ky. 1955)). However, "'if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant.'" *Brock*, 327 S.W.3d at 694 (quoting *Banks*, 564 S.W.2d at 951). "Photographs of a corpse are admissible in murder prosecutions if they are relevant to the issues at trial, notwithstanding their gruesome and horrifying character, and photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used." *State v. Derek Williamson*, No. M2010-01067-CCA-R3-CD, 2011 WL 3557827, at *9 (Tenn. Crim. App. Aug. 12, 2011) (citing *Collins v. State*, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973)).

At trial, the State entered into evidence, without objection, a picture of the victim when he was still alive. The State then sought to enter into evidence an autopsy photograph of the left side of the victim's face. Trial counsel objected to the admission of the autopsy photograph and offered to stipulate that the victim was deceased. In overruling trial counsel's objection, the trial court noted that more gruesome photographs would be admitted through the medical examiner and stated, "[Y]ou're telling me now the same pictures or worse are going to come in later, then I don't see any real harm, you know. I'm going to overrule the objection."

Our court addressed a substantially similar situation in *State v. Terrell Loverson*, stating:

> In a murder trial, the State must prove that a victim was killed. In this case, the State introduced, without objection, a photograph of the victim while he was alive. . . . The photograph of the victim taken during the autopsy, admitted through Dr. Ross, permitted the jury to determine whether the

victim about whom Rainey (and others) testified was the person who, in fact, had been killed. Therefore, we agree with the trial court that the photograph was relevant as corroborative proof of the victim's identity. *See* Tenn. R. Evid. 401 (defining relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence").

Moreover, the probative value of the photograph was not "substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403. While the photograph depicts the victim as deceased, the photograph is in no way gruesome, nor does it show the victim's body "to be in an altered condition due to the autopsy." *State v. Young,* 196 S.W.3d 85, app. 129-30 (Tenn. 2006). . . .

No. W2011-02055-CCA-R3-CD, 2012 WL 5509776, at *7 (Tenn. Crim. App. Nov. 14, 2012). We agree with the logic employed in *Terrell Loverson*. The picture of the victim's face was relevant to prove the identity of the deceased victim, and the victim's sister identified the victim in the autopsy photograph. Furthermore, we note that the autopsy photograph of the victim's face did not show any of the victim's injuries and was not particularly gruesome. The victim's face in the photograph was also unaltered due to the autopsy. Accordingly, we conclude that the trial court did not abuse its discretion in admitting the photograph into evidence. Appellant Taylor is not entitled to relief.

### F. Tennessee Rule of Evidence 803(26)

Both appellant Taylor and appellant Wilson challenge the trial court's application of Tennessee Rule of Evidence 803(26). Appellant Taylor argues that Chris Williams' police statement was erroneously admitted into evidence, and appellant Wilson challenges the admission of Jarquez McKinley's police statement. The State responds that both statements were properly admitted into evidence.

At trial, both witnesses claimed a lack of memory regarding the incident due to alcohol or substance abuse at the time of the shooting. Due to their memory loss, the State sought admission of both witnesses' police statements given shortly after the shooting. Tennessee Rules of Evidence 613(b) and 803(26) govern the admission of the statements.

Rule 613(b) addresses the use of a witness's prior inconsistent statement. It states:

Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain

or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 803(1.2).

The purpose of Rule 613(b) is to allow the introduction of otherwise inadmissible extrinsic evidence for the purpose of impeachment. *State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998) (citing *State v. Reece,* 637 S.W.2d 858, 861 (Tenn.1982)). This court has stated that extrinsic evidence of a prior inconsistent statement is appropriate if the witness "denies or does not recall making the statement" or if the witness "equivocates about making it." *State v. Ackerman*, 397 S.W.3d 617, 638 (Tenn. Crim. App. 2012); *State v. Kendricks*, 947 S.W.2d 875, 882 (Tenn. Crim. App. 1996). Normally, "prior inconsistent statements offered to impeach a witness are to be considered only on the issue of credibility, and not as substantive evidence of the truth of the matter asserted in such statements." *Reece*, 637 S.W.2d at 861.

However, Rule 803(26) governs the admissibility of a prior inconsistent as substantive evidence, stating:

A statement otherwise admissible under Rule 613(b) [is not excluded by the hearsay rule] if all of the following conditions are satisfied:

(A) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.

(B) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement given under oath.

(C) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

The Advisory Commission Comments clarify that "only prior inconsistent statements, and not consistent statements, are within the ambit of this rule." *See* Tenn. R. Evid. 803(26), Adv. Comm'n Cmts.; *see also State v. Robert Allen Zaloba*, No. M2011-00855-CCA-R3-CD, 2012 WL 6690027, at *20-22 (Tenn. Crim. App. Dec. 26, 2012) (explaining that Tennessee Rule of Evidence 106, the "rule of completeness," is inapplicable to statements admitted pursuant to Rule 803(26)).

Our supreme court has recently espoused the standard of review for hearsay statements:

The standard of review for rulings on hearsay evidence has multiple layers. Initially, the trial court must determine whether the statement is hearsay. If the statement is hearsay, then the trial court must then determine whether the hearsay statement fits within one of the exceptions. To answer these questions, the trial court may need to receive evidence and hear testimony. When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one the exceptions to the hearsay rule—are questions of law subject to de novo review.

*Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015) (citations omitted).

### 1. Ms. Williams' Statement

Appellant Taylor challenges the admission of Chris Williams' police statement. Specifically, he argues that her statement was not made under circumstances indicating trustworthiness due to her admitted substance abuse and that parts of her redacted statement, as entered into evidence, were not actually inconsistent with her testimony.

First, we will address appellant's concerns regarding the trustworthiness of Ms. Williams' statement. During her testimony, Ms. Williams asserted that she was unsure if the information in her statement to police was correct because she was intoxicated when she witnessed the shooting. Ms. Williams further asserted that she had "totally blocked [the shooting] out" and therefore did not remember what occurred.

In a jury-out hearing, Lieutenant Mullins testified that on October 20, 2010, Ms. Williams called the police department and stated that she had witnessed the shooting. About two hours after the shooting, Lieutenant Mullins met Ms. Williams, picked her up, and took her to the police station to give a statement. Lieutenant Mullins described Ms. Williams as seeming "a little scared and nervous" but otherwise unimpaired. Lieutenant Mullins did not smell the residual odor of used narcotics. Ms. Williams was responsive and able to relay information to Lieutenant Mullins. Lieutenant Mullins stated that Ms. Williams reviewed, initialed, and signed her statement.

Rule 803(26)(C) requires that in a jury-out hearing, the trial court must make a determination regarding whether the witness's statement was made under circumstances indicating trustworthiness. In doing so, the trial court found that Ms. Williams was "feigning her lack of memory." The trial court stated:

I don't know the reason. I do know that this particular witness was afraid -- whether it was founded or not was afraid. I don't know why she changed her testimony, but I just -- I don't find her credible.

Her presentation from the stand. She was all over the place. She said different things so many times, I don't think that she would recognize the truth if it hit her in the rear end.

It's an instinct call. I just don't -- I think she's feigning it all. So, I don't find her testimony that she was so high on drugs that she didn't know what she was saying to be credible. This -- I think it's incredible that she cannot remember a thing about it, but then say that some things are not true. I mean, she's just all over the place.

. . . .

I think that the statement was given under circumstances that it was trustworthy, and I think all of this is good fodder for the jury to decide, but I'm going to send it all to the jury[,] and I'll give the 803(26) instruction with regard to this prior statement.

As a finding of credibility, we will not revisit the trial court's decision that Ms. Williams' trial testimony was not credible, thereby implicitly crediting Lieutenant Mullins' testimony. *See Kendrick*, 454 S.W.3d at 479 (citations omitted). Lieutenant Mullins explained that while Ms. Williams seemed nervous and afraid, she did not appear to be impaired. He asserted that Ms. Williams was responsive and able to relay pertinent information. Therefore, based on the trial court's credibility finding and the testimony offered by Lieutenant Mullins, we conclude that Ms. Williams' statement was offered under circumstances of trustworthiness.

Appellant also argues that two parts of Ms. Williams' police statement should have been redacted because they were not inconsistent with her testimony at trial. We will address each segment of the statement in turn. The first challenged segment, as written, is as follows:

Q: Do you know who is responsible for Lyle King's death?

A: Yes. I know him by the nickname "Woo[."]

During her testimony, Ms. Williams agreed that she told police that appellant Taylor was responsible for the victim's death. However, later in her testimony, after she was shown her police statement, Ms. Williams's unedited testimony was, "I don't remember nothing,

-33-

that basically what happened until I read this.  I totally blocked it out."  She further testified that her police statement did not refresh her memory about what she told the police in October 2010.

While it is true that "'[e]xtrinsic evidence of a prior inconsistent statement remains inadmissible when a witness unequivocally admits to having made the prior statement,'" if the witness later equivocates, extrinsic evidence of the prior statement becomes admissible.  *Ackerman*, 397 S.W.3d at 638 (citation omitted).  Although Ms. Williams initially agreed that she told the police that appellant Taylor was responsible for the victim's death, she later equivocated, saying that she did not remember what she told law enforcement and that she had blocked out the entire event.  Therefore, her testimony at trial was inconsistent with her prior police statement.  The trial court did not err by refusing to redact this segment of Ms. William's police statement.

The second challenged statement, as written, states:

Q:  Can you describe to me, in your own words, what happened before, during, and after the shooting?

A: I saw some ladies fighting in the middle of the street on McMillan.  As I was driving up, a commotion started and then I saw people jumping on the guy.  As they were jumping on them he hit the ground.  "Woo" started complaining about getting hit hard and went to the car, his white Impala, and got his gun.  He stood over him and shot him.

Appellant argues that this statement should not have been admitted because at trial, Ms. Williams was never asked if she saw appellant Taylor retrieve a gun from his car.  However, she was impeached with her statement in this regard during the State's re-direct examination.  Rule 613(b) mandates that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same."  However, appellant Taylor failed to make an objection on this basis at trial.  Now, on appeal, he requests plain error review.

The accepted test for plain error review requires that:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused did not waive the issue for tactical reasons; and
(e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). To rise to the level of "plain error," an error "'must [have been] of such a great magnitude that it probably changed the outcome of the trial.'" *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)). All five factors must be established by the record before a court will find plain error. *Smith*, 24 S.W.3d at 282. Complete consideration of all the factors is not necessary when clearly at least one of the factors cannot be established by the record. We apply a de novo standard of review to determine if the five plain error factors have been satisfied. *State v. Cooper*, 321 S.W.3d 501, 506 (Tenn. 2010).

After reviewing the record, we conclude that appellant has failed to satisfy factors (b), (c), and (e). As stated above, Ms. Williams clearly asserted that she did not remember the shooting and that she had "totally blocked it out." She further testified that her police statement did not refresh her memory about what she told the police in October 2010. The State then tried to refresh Ms. Williams' memory regarding the challenged statement,[6] and Ms. Williams said, "I don't remember this." Therefore, she had already thoroughly repudiated her police statement to law enforcement before she was impeached with her statement regarding appellant Taylor's retrieving a weapon from a car. This court has stated that extrinsic evidence of a prior inconsistent statement is appropriate if the witness "denies or does not recall making the statement." *Kendricks*, 947 S.W.2d at 882. Appellant Taylor has failed to show that a clear and unequivocal rule of law was breached.

Appellant Taylor has also failed to show that a substantial right was adversely affected or that consideration of the error is "necessary to do substantial justice." As stated in *supra* subsection B, there were numerous eye witnesses that identified appellant Taylor as one of the shooters at the scene and both of the victims suffered multiple gunshot wounds. While some of the defense witnesses attempted to exonerate appellant Taylor, the jury obviously credited the testimony of the State's witnesses. Given this weight of information against appellant Taylor at trial, the admission of the challenged statement did not adversely affect appellant Taylor's rights, and it is not necessary to provide relief to do substantial justice. Appellant Taylor is not entitled to relief on this issue.

### 2. Mr. McKinley's Statement

Appellant Wilson challenges the admission of Jarquez McKinley's police statement into evidence. Specifically, appellant Wilson argues that Mr. McKinley's trial

---

[6] The State specifically asked Ms. Williams to look at the last question on page 2 of her police statement, which we note is the segment of the police statement that appellant Taylor now challenges.

testimony was not inconsistent with his prior statement and that the statement was not made under circumstances indicating trustworthiness. Finally, appellant Wilson argues that his Confrontation Clause rights were violated by the admission of Mr. McKinley's police statement. The State responds that Mr. McKinley's police statement was properly admitted as substantive evidence. We will address each argument in turn.

First, appellant Wilson argues that Mr. McKinley's trial testimony was not inconsistent with his police statement. At trial, Mr. McKinley could not remember the events of October 20, 2010, and could not remember giving the police a statement regarding the incident. Mr. McKinley blamed his lapse of memory on his alcoholism. Mr. McKinley also asserted that the initials and signatures on his police statement and his advice to witness a photographic lineup form were not made by him. Mr. McKinley was also unable to remember writing on or signing any photographic identifications. In response, Detective Wilkie testified that during his police interview, Mr. McKinley appeared to understand what was occurring and did not appear to be intoxicated. Initially, Mr. McKinley told Detective Wilkie varying versions of the shooting, but after being confronted with information from other witnesses, Mr. McKinley finally stated that he had fought with the victim and that appellant Wilson had shot the victim. Detective Wilkie stated that Mr. McKinley either initialed or signed his advice of rights form, his police statement, his advice to witness form, and his photographic identifications of appellants Taylor and Wilson. The trial court overruled defense counsel's objection to the admission of Mr. McKinley's statement and later stated, "I didn't say it previously with regard to the prior witness, this Jarquez fellow, but I thought he was lying through his teeth, also feigning his lack of memory."

This court has stated that extrinsic evidence of a prior inconsistent statement is appropriate if the witness "denies or does not recall making the statement." *Kendricks*, 947 S.W.2d at 882. Therefore, when Mr. McKinley asserted that he could not remember making the police statement, it was appropriate for the State to impeach him with his prior statement.

Regarding whether the statement was made under circumstances indicating trustworthiness pursuant to Rule 803(26)(C), appellant Wilson argues that Mr. McKinley was intoxicated when he observed the shooting and possibly when he gave his police statement. The trial court conducted the required jury-out hearing and determined that the statement was offered under circumstances indicating trustworthiness. The trial court explained that Mr. McKinley came to the police, gave a statement, and signed it. The trial court also later opined that Mr. McKinley was "lying through his teeth" and was feigning his memory loss. As a finding of credibility, we will not revisit the trial court's decision that Mr. McKinley's trial testimony was not credible, thereby implicitly crediting Detective Wilkie's testimony. *See Kendrick*, 454 S.W.3d at 479 (citations omitted). Detective Wilkie testified that during his police interview, Mr. McKinley appeared to

understand what was occurring and did not appear to be intoxicated. Detective Wilkie also stated that Mr. McKinley either initialed or signed his advice of rights form, his police statement, his advice to witness form, and his photographic identifications of appellants Taylor and Wilson. Therefore, based on the trial court's credibility finding and the testimony offered by Detective Wilkie, we conclude that Mr. McKinley's statement was offered under circumstances of trustworthiness.

Finally, appellant Wilson argues that his Confrontation Clause rights were violated by the admission of Mr. McKinley's police statement and that Tennessee Rule of Evidence 803(26) is fundamentally unfair. However, appellant Wilson has failed to cite any case law supporting his argument. Appellate briefs *shall* contain "the contentions of the appellant with respect to the issues presented, . . . including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on . . . ." Tenn. R. App. P. 27(a)(7) (emphasis added); *see* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); *see also Berry v. State*, 366 S.W.3d 160, 169 (Tenn. Crim. App. 2011). Furthermore, because Mr. McKinley was present at trial, testified before the jury, and was subject to cross-examination, the admission of his statements did not rise to the level of a constitutional violation. *See State v. Davis*, 466 S.W.3d 49, 68-69 (Tenn. 2015); *State v. Brandon Ackerman,* No. M2010-01979-CCA-R3-CD, 2012 WL 2870568, at *17 (Tenn. Crim. App. July 13, 2012)). Appellant is not entitled to relief on this issue.

## G. Cumulative Error

Appellant Taylor argues that he is entitled to a new trial due to cumulative errors throughout his trial. However, he has failed to prove that any errors were committed at trial. Therefore, we conclude that he is not entitled to a new trial on this basis.

## H. Consecutive Sentencing

Appellant Taylor contests the consecutive alignment of his sentences. The State responds that consecutive sentencing was appropriate in this case.

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn.

Code Ann. §§ 40-35-103(5), -113, -114, -210(b). In addition, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(4).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). Prior to 2013, on appellate review of sentence alignment issues, courts employed the abuse of discretion standard of review. *See State v. Hastings*, 25 S.W.3d 178, 181 (Tenn. Crim. App. 1999). Our supreme court has since extended the standard of review enunciated in *State v. Bise*, abuse of discretion with a presumption of reasonableness, to consecutive sentencing determinations. *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013); *Bise*, 380 S.W.3d at 707 (modifying standard of review of within-range sentences to abuse of discretion with a presumption of reasonableness); *see also State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying abuse of discretion with a presumption of reasonableness to review of alternative sentencing determinations by the trial court). Thus, the presumption of reasonableness gives "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b) . . . ." *Pollard*, 432 S.W.3d at 861.

The procedure used by the trial courts in deciding sentence alignment is governed by Tennessee Code Annotated section 40-35-115, which lists the factors that are relevant to a trial court's sentencing decision. Imposition of consecutive sentences must be "justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102(1). The length of the resulting consecutive sentence must be "no greater than that deserved for the offense committed." *Id.* § 40-35-103(2). The court may order consecutive sentences if it finds by a preponderance of the evidence that one or more of the following seven statutory criteria exists:

(1)     The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2)     The defendant is an offender whose record of criminal activity is extensive;

(3)     The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

-38-

(4)     The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

(5)     The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6)     The defendant is sentenced for an offense committed while on probation; or

(7)     The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b).

The *Pollard* court reiterated that "[a]ny one of these grounds is a sufficient basis for the imposition of consecutive sentences." *Pollard*, 432 S.W.3d at 862 (citing *State v. Dickson*, 413 S.W.3d 735, 748 (Tenn. 2013)). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.* If, as in this case, the trial court relies on subsection (4) of the statute governing consecutive sentencing, the court must make additional findings pursuant to *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995). Under *Wilkerson*, before imposing consecutive sentences based upon the defendant's status as a dangerous offender, the trial court "must conclude that the evidence has established that the aggregate sentence is 'reasonably related to the severity of the offenses' and 'necessary in order to protect the public from further criminal acts.'" *Pollard*, 432 S.W.3d at 863 (quoting *Wilkerson*, 905 S.W.2d at 938). If the trial court properly follows the *Wilkerson* procedure, the standard of review enunciated above will govern the trial court's determination.

Of the seven statutory factors, the trial court in this case found that the "dangerous offender" factor applied to appellant's sentences. Tenn. Code Ann. § 40-35-115(b)(4). Appellant Taylor does not contest his sentence based on trial court error in failing to make the requisite *Wilkerson* findings. Rather, he concedes that the trial court correctly followed the procedure but argues that the court nonetheless erred in its findings. Because the trial court complied with *Wilkerson* in reaching its conclusion, we attach a presumption of reasonableness to its determination and review for abuse of discretion.

"Generally, '[a] trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party.'" *State v. Farrer*, 355 S.W.3d 582, 586 (Tenn. Crim. App. 2011) (quoting *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010)).

At the sentencing hearing, the State introduced appellant Taylor's presentence report as an exhibit, and the parties agreed that appellant Taylor should be sentenced as a Range I, standard offender. The State advised the trial court that appellant Taylor was also in custody on other matters, having been accused of committing aggravated robbery on January 13, 2010, and committing another murder on November 25, 2009. Neither party presented witnesses, but appellant Taylor expressed his desire to allocute. In addressing the court, appellant maintained his innocence of shooting, harming, or killing anyone. Following the arguments of counsel, the trial court fixed appellant Taylor's sentence for attempted first degree murder at the middle of the range, twenty years.[7] The trial court then ordered consecutive alignment of the twenty-year sentence to appellant Taylor's life sentence for first degree murder. In so ordering, the trial court stated:

> I do find the defendant's a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime to which the risk to human life is high.

> I also found the circumstances surrounding the commission of these offenses are aggravated. Basically while I understand there was a fight, they basically unloaded their weapons in one of these guys and tried to shoot multiple times at another in the needless overly aggressive fashion. So I do think it was exaggerated.

> I think confinement for an extended period of time is necessary to protect society from this defendant's unwillingness to lead a productive life and the defendant's resort to criminal active in furtherance of this anti-societal lifestyle.

> And I also think that the aggregate length of the sentences reasonably relate[s] to the offense[s] for which the defendant stands convicted.

---

[7] Appellant Taylor does not contest his mid-range sentence of twenty years or the trial court's application of enhancing or mitigating factors. Therefore, we will omit a discussion thereof in this analysis.

Appellant Taylor contends that the trial court erred in its findings in this regard because consecutive sentencing is not necessary to protect the public. In support of this contention, appellant Taylor contends that: (1) due to his age, he will be seventy years old before he is parole-eligible on his first degree murder sentence; therefore, it was unnecessary to add a consecutive twenty-year sentence to the life sentence; (2) appellant Taylor was acting in the heat of the moment and with the intent to protect others from the victims; and (3) his adult criminal record does not suggest that he is a threat to the public. He also asserts that consecutive sentencing does not reasonably relate to the severity of the crimes in this case, citing again his alleged "state of passion produced by adequate provocation." Finally, he makes the general argument this sentence alignment violates the principle of sentencing that the length of a sentence must be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed."

Appellant Taylor's argument that his advanced age at parole-eligibility somehow precludes application of the principles of consecutive sentencing is unavailing. There is no support in statutory or case law for this proposition. Rather, this court has upheld lengthy sentences that place defendants' release eligibility far past the age of ordinary longevity. *See, e.g., State v. James L. Dowell, III & Rivera L. Peoples,* No. M2012-00520-CCA-R3-CD, 2013 WL 1804191, at *23 (Tenn. Crim. App. April 30, 2013) (affirming effective 100-year sentence for multiple counts of especially aggravated kidnapping and aggravated robbery); *State v. Mauricio Morales*, No. M2010-01236-CCA-R3-CD, 2012 WL 3731691, at *11 (Tenn. Crim. App. Aug. 29, 2012) (upholding a 100-year effective sentence for rape of a child (and other offenses) that required 100% release eligibility). Appellant Taylor's argument that he was acting in the heat of passion and under adequate provocation must also fail; he stands convicted of first degree murder and attempted first degree murder, not voluntary manslaughter. While appellant Taylor's *conviction* record as an adult is unimpressive, the State set forth that appellant Taylor also stands accused of two other crimes of violence, which belies his contention that his record of criminal behavior is minimal.

At trial, Cheryl, Stefanie, Chris Williams, and Joycelyn Key all identified appellant Taylor as one of the shooters. Ms. Williams explained that immediately prior to the shooting, she heard appellant Taylor complaining about the victim's hitting him too hard and that appellant Taylor then went and retrieved a gun from a car. In her statement to police, Ms. Williams stated that there were three shooters at the scene and that she saw appellant Taylor shoot the victim. She also saw appellant Taylor and another shooter fire at another male as the male ran from the scene. The victim suffered nine gunshot wounds from three separate weapons, which resulted in his death. Julian Williams suffered three gunshot wounds. Dr. Ross clarified that it was the combined effect of the multiple gunshot wounds that lead to the victim's death. These facts, accredited by the jury's verdict, support the trial court's conclusion "that the aggregate length of the sentences

reasonably relate[s] to the offense[s] for which [appellant] stands convicted." The trial court did not abuse its discretion in ordering consecutive sentence alignment.

## I.  Correction of Judgment

We note that on appellant Taylor's judgment for attempted murder, the trial court failed to mark the box "Guilty," but it did mark the box "Jury Verdict."  Upon review of the record, it is clear that the jury found appellant Taylor guilty of the alleged offense and that the failure to mark guilty on the judgment was merely a clerical error.  As such, we remand this case to the trial court for correction of the judgment.

## CONCLUSION

Based on the parties' arguments, the record, and the applicable law, we affirm the judgments of the trial court and remand for correction of appellant Taylor's attempted murder judgment.

_____
ROGER A. PAGE, JUDGE